**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2037-19

MONTGOMERY STREET
HOUSING URBAN
RENEWAL, LLC,

     Plaintiff-Respondent,

v.

ZAINAB SHERIFF,

     Defendant-Appellant.

_____

Submitted March 2, 2021 – Decided June 25, 2021

Before Judges Moynihan and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. LT-27289-19.

Essex-Newark Legal Services, attorneys for appellant (Nicholas Bittner and Felipe Chavana, on the briefs).

Ehrlich, Petriello, Gudin & Plaza, attorneys for respondent (Matthew A. Sebera and Derek D. Reed, on the brief).

PER CURIAM

Defendant Zainab Sheriff appeals a judgment of possession granted to plaintiff Montgomery St. Housing Urban Renewal, LLC.  Because the trial court's finding that plaintiff was entitled to a judgment based on defendant's non-compliance with an unauthorized-occupant lease term is supported by substantial credible evidence, we affirm.

Plaintiff is the landlord of a residential apartment complex located in Newark known as Montgomery Heights Apartments.  Montgomery Heights operates under guidelines established for the Project Based Voucher[1] (PBV) and Low-Income Housing Tax Credit (LIHTC)[2] programs of United States

---

[1] PBVs "are a component of a public housing agency's (PHA's) Housing Choice Voucher (HCV) program."  U.S. Dep't of Hous. & Urb. Dev., Project Based Vouchers, https://www.hud.gov/program_offices/public_indian_housing/ programs/hcv/project (last visited May 19, 2021).  PBVs "[e]ncourage[] property owners to construct, rehabilitate, or make available existing housing units to lease to very low[-]income families."  U.S. Dep't of Hous. & Urb. Dev., Housing Choice Vouchers List, https://www.hud.gov/program_offices/ public_indian_housing/programs/hcv/about/list (last visited May 21, 2021). The HCV program "is the federal government's major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market. . . . [HCVs] are administered locally by public housing agencies[, which] receive federal funds . . . to administer the voucher program."  U.S. Dep't of Hous. & Urb. Dev., Housing Choice Vouchers Fact Sheet, https://www.hud.gov/program_offices/public_indian_housing/ programs/hcv/about/fact_sheet (last visited May 21, 2021).

[2] The LIHTC program "is the most important resource for creating affordable housing in the United States today . . . giv[ing] State and local LIHTC-allocating

A-2037-19

Department of Housing and Urban Development (HUD). As a result, Montgomery Heights applicants must meet the criteria for both the PBV and LIHTC programs. In turn, applicants who qualify and become tenants receive subsidized rent. Montgomery Heights has a two- to three-year wait list of applicants.

HUD establishes income limits "to ensure that federal rental assistance is provided only to low-income families"; to be eligible for occupancy, an applicant's family income cannot "exceed the applicable income limit." U.S. Dep't of Hous. & Urb. Dev., HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs, §§ 3-6 and 3-6(A) (Nov. 2013). HUD also requires property owners participating in its subsidized multifamily housing programs to "assign to a family a unit of appropriate size." Id. § 3-23(B)(1). Occupancy standards "serve to prevent the over- or underutilization of units that can result in an inefficient use of housing assistance" and "ensure that applicants and tenants are housed in appropriately sized units in a fair and

agencies . . . annual budget authority to issue tax credits for the acquisition, rehabilitation, or new construction of rental housing targeted to lower-income households." U.S. Dep't of Hous. & Urb. Dev., Off. of Pol'y Dev. & Resch., Low-Income Housing Tax Credit (LIHTC), https://www.huduser.gov/portal/datasets/lihtc.html (last visited May 21, 2021).

consistent manner as prescribed by law." Id. § 3-23(A)(2).  A property owner has discretion "in developing occupancy policies that meet the needs of the specific property" but "must follow" HUD guidelines "when developing written occupancy standards."  Id. § 3-23(E)(1).  Typically, a "two-persons-per-bedroom standard is acceptable."  Id. § 3-23(E)(2) and (4).

Montgomery Heights has a resident selection plan to ensure applicants are chosen in accordance with HUD and LIHTC requirements and established management policies.  The selection plan references the HUD requirement that a property manager use income limits in determining eligibility and explains how a tenant's subsidized rent is based on household income.  The selection plan also sets forth Montgomery Heights's occupancy standards, which, following HUD guidelines, require a minimum of three and maximum of six household members to live in a three-bedroom apartment, the largest apartment at Montgomery Heights.  The selection plan also sets forth the procedural steps required to add a household member after initial occupancy, including that any new proposed household member is subject to an eligibility determination and must be approved before moving into the unit.  According to plaintiff's project

4

manager, plaintiff's resident selection plan was authorized by the New Jersey Housing and Mortgage Finance Agency (NJHMFA).[3]

On December 15, 2016, defendant executed a "COMPLIANCE APPLICATION," seeking to lease a three-bedroom apartment at Montgomery Heights. In the application, defendant certified: she was the head of a five-person household, which included defendant and her four children; her marital status was "separated"; she expected no additions to the household in the next year; and there were no "absent" household members who under normal conditions would be living with her.

The application was approved, and defendant signed a lease for a three-bedroom apartment for a term ending on April 30, 2018. The lease limited the number of people allowed to live in the apartment to one adult and four children, specifically named the authorized occupants, and permitted the landlord to end the lease with thirty-days' written notice after serving a notice to cease if any unauthorized occupant lived in the leased apartment.

---

[3] The compliance division of NJHMFA "is responsible for monitoring all properties with tax credit financing" in New Jersey. N.J. Hous. & Mortg. Fin. Agency, Compliance, https://www.njhousing.gov/dca/hmfa/developers/lihtc/compliance (last visited May 21, 2021).

In February 2018, defendant completed a "RECERTIFICATION QUESTIONNAIRE," in which she again declared she was the head of a five-person household, consisting of herself and her four children and there were no absent household members who under normal conditions would live with her or planned on living with her in the future.

On April 26, 2018, defendant executed an "AFFORDABLE HOUSING LEASE AGREEEMENT," for the same three-bedroom apartment beginning on May 1, 2018. Defendant certified she was the head of a five-person household with one other adult[4] and three children, listing the same individuals she had listed in her application, the prior lease, and her recertification questionnaire. Defendant agreed to "immediately notify the [l]andlord of all changes in household composition." The lease contained the following terms:

> For any adult persons to be added to the [l]ease, they must fill out an application and all persons must meet the [l]andlord's "Tenant Selection Criteria." Any occupant deemed permanent by the [l]andlord that does not comply with this procedure or vacate promptly when determined ineligible or jeopardizes the household tax credit compliance is the responsibility of the [t]enant and grounds for termination of the [l]ease.
>
> USE OF PROPERTY. The [a]partment is to only be used as a private residence by the [t]enant(s) and occupants listed above. No additional occupants are

---

[4] The other adult was the oldest "child" defendant had identified previously.

permitted. IF ANY OTHER PERSON IS FOUND LIVING IN THE APARTMENT THE TENANT AGREES THAT THE LANDLORD MAY TERMINATE THIS LEASE. The [t]enant may not sublease the [a]partment or assign this [l]ease.

. . . .

Further, the [t]enant agrees to take no action to jeopardize the [l]andlord's tax credit compliance. Should it be determined that [t]enant's continued occupancy, for whatever reason, jeopardizes the [l]andlord's tax credit compliance, the [t]enant agrees to voluntarily relocate to another dwelling and relinquish tenancy in their current unit.

. . . .

RULES AND REGULATIONS. The [t]enant, all other occupants of the [a]partment and guests shall comply with all governmental laws and regulations and all rules and regulations contained in this [l]ease.

The lease also provided plaintiff could evict defendant if defendant did "not comply with all the terms of this [l]ease." The lease's definition of "[m]aterial non-compliance with the terms of this [l]ease" included "permitting [an] unauthorized person to live in the unit."

On January 2, 2019, defendant completed a "NJHMFA LOW INCOME TAX CREDIT TENANT INCOME SELF CERTIFICATION," in which she certified she had the same household composition described in the lease.

7

On April 11, 2019, plaintiff served a "NOTICE TO CEASE/COMPLY" on defendant pursuant to N.J.S.A. 2A:18-61.1(e)(1). The notice advised defendant plaintiff had "discovered that a male individual . . . who is believed to be your husband . . . residing in your unit despite not having authorization from the [l]andlord to do so." Because defendant's husband was not listed as an authorized occupant on the lease and had not been approved by plaintiff to reside in the apartment and relying on multiple provisions of the lease, plaintiff advised defendant that if her husband did not vacate the apartment on or before April 26, 2019, plaintiff would "take steps to terminate [her] tenancy."

Instead of removing her husband from her apartment by April 26, 2019, defendant, on June 6, 2019, delivered a letter to plaintiff requesting her husband and son be permitted to submit an application to be added to the lease. Before she provided that letter, her husband on June 3, 2019, submitted to the United States Postal Service a change-of-address form, indicating his mail should be sent to a post office box instead of defendant's Montgomery Heights apartment, where it had been sent.

On June 10, 2019, plaintiff served on defendant a "LOW INCOME HOUSING TAX CREDIT NOTICE TO QUIT AND DEMAND FOR POSSESSION." The notice advised defendant her lease would terminate on July

8

31, 2019. Plaintiff cited in the notice defendant's failure to remove her husband from the apartment in accordance with the Notice to Cease and her continuing violation of the lease by permitting him to live in the apartment.

After defendant failed to vacate the apartment by July 31, 2019, plaintiff filed a complaint for possession on September 18, 2019. At trial, plaintiff's property manager and defendant testified. Defendant asserted her "spacious" apartment could comfortably fit herself, her five children, and her husband. She conceded her husband had been "in and out" of the apartment and had received mail there since January 2019. She also testified her thirteen-year-old had moved into the apartment in August 2019. On January 9, 2020, the trial court in an oral decision held plaintiff was entitled to a judgment of possession for a violation of the lease terms, finding "there has been substantial non-compliance by unauthorized occupants."

On appeal, defendant argues the court lacked jurisdiction to enter the judgment for possession because her June 6 letter constituted compliance with the Notice to Cease; the purported grounds for terminating defendant's tenancy, which defendant describes as a "household size exceed[ing] plaintiff's two-person-per-bedroom occupancy standard," did not exist at the time plaintiff issued the Notice to Quit when six people lived in the apartment; and the Notice

to Quit was not based on plaintiff's actual reason for terminating defendant's tenancy, which, according to defendant, was the anticipation defendant's household "could come to exceed plaintiff's bedroom distribution standard." Defendant also argues "family reunification" does not constitute good cause to evict; a seven-person occupancy does not violate LIHTC or HUD regulations; and defendant's eviction is contrary to law.

We review a judgment of possession based on an abuse-of-discretion standard. Cmty. Realty Mgmt. v. Harris, 155 N.J. 212, 236 (1998). We defer to and leave undisturbed factual findings made by a judge after a bench trial as long as they are supported by substantial credible evidence. Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017). We review a trial court's legal conclusions de novo. Clark v. Nenna, 465 N.J. Super. 505, 511 (App. Div. 2020).

A landlord must prove "one of the statutorily enumerated 'good cause' grounds for eviction" to be granted judgment of possession. Sudersan v. Royal, 386 N.J. Super. 246, 251 (App. Div. 2005) (referencing the Anti-Eviction Act, N.J.S.A. 2A:18-61.1 to -.12); see also 175 Exec. House, L.L.C. v. Miles, 449 N.J. Super. 197, 202 (App. Div. 2017). A continuing substantial violation of a reasonable lease term, after the tenant has received a written notice to cease, is

one of the statutory good causes for eviction.  See N.J.S.A. 2A:18-61.1(e)(1); see also Hous. & Redev. Auth. v. Mayo, 390 N.J. Super. 425, 432 (App. Div. 2007) (holding a material noncompliance with a lease term constitutes grounds for eviction under both federal law controlling public housing and New Jersey's Anti-Eviction Act).  Generally, a lease is enforced "as it is written, absent some superior contravening public policy."  Hous. Auth. & Urb. Redev. Agency v. Taylor, 171 N.J. 580, 586 (2002).

The terms of defendant's lease were clear and unambiguous.  The apartment "is to only be used as a private residence by the [t]enant(s) and occupants listed above.  No additional occupants are permitted."  The lease set forth in capital letters:  "IF ANY OTHER PERSON IS FOUND LIVING IN THE APARTMENT THE TENANT AGREES THAT THE LANDLORD MAY TERMINATE THIS LEASE."  The lease required "any adult persons to be added to the [l]ease . . . [to] fill out an application and all persons must meet the [l]andlord's 'Tenant Selection Criteria'" and made noncompliance "the responsibility of the [t]enant and grounds for termination of the [l]ease."

The unauthorized-occupant provisions of the lease are reasonable and consistent with public policy.  They ensure a tenant is in compliance with occupancy standards, which provide for proper utilization of housing units and

fairness to applicants and tenants. See U.S. Dep't of Hous. & Urb. Dev., HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs, § 3-23(A)(2) (Nov. 2013). They also ensure compliance with household income limitations by preventing a tenant from adding an occupant whose income could cause the household income to exceed the income limit required by HUD. Id. § 3-6(A). We already have recognized the enforceability of unauthorized-occupant lease provisions. Mayo, 390 N.J. Super. at 433 (finding tenant had "substantially breached the lease" by "permitting unauthorized persons, who might not have qualified for public housing, to reside in the publicly supported apartment").

With its NOTICE TO CEASE/COMPLY,[5] plaintiff gave defendant an opportunity in April to cure her lease violation. Instead of curing, she kept her unauthorized occupant in the apartment and later doubled down by adding another unauthorized occupant. Sending a letter asking to submit an application for approval of additional occupants – something the lease required her to do

---

[5] Contrary to defendant's argument, the notice to cease did not authorize the submission of an application for approval of an additional occupant; it quoted a lease provision defendant already had violated by failing to submit the application and obtain authorization before her husband moved into the apartment.

before any additional occupant moved in, not six months after – did not cure the lease violation. The cure for the lease violation was removing the unauthorized occupant from the apartment.[6]

The trial court's finding of noncompliance with the unauthorized-occupant terms of the lease was supported by substantial credible evidence, and we see no abuse of discretion in its conclusion plaintiff was entitled to a judgment of possession based on that breach. Accordingly, we affirm.

We find insufficient merit in defendant's remaining arguments to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] Unlike the defendant in Mayo, who had her unauthorized occupants vacate her apartment two days before trial, id. at 429, defendant failed to cure her lease violation before trial. Thus, the basis of the remand we ordered in Mayo, id. at 434 (questioning the adequacy of defendant's attempt to cure), does not exist here.

A-2037-19